IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

GREAT AMERICAN INSURANCE COMPANY,

        Plaintiff,

v.                                      CIVIL ACTION NO.  2:11-cv-00396

HINKLE CONTRACTING CORPORATION, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is the Defendant's Motion to Dismiss or Stay Proceedings Pending Arbitration [Docket 15].  For the reasons discussed below, this motion is **DENIED**.

**I.**    **Background**

        A.    *Facts and Procedural Posture*

Hinkle Contracting Company, LLC ("Hinkle" and "HCC") entered into a contract with the West Virginia Department of Transportation to construct portions of the King Coal Highway project in Mingo County, West Virginia.  Hinkle and Chapman-Martin Excavation and Grading, Inc. ("CME") then entered into a subcontract for CME to perform grade and drain work on the project.  Great American Insurance Company ("Great American") issued a Subcontract Performance Bond and Subcontract Labor and Material Payment Bond for CME, with Hinkle as obligee.

On June 2, 2011, Great American filed a Complaint for Declaratory Judgment in this court.  Great American alleges that beginning in September 2010, Hinkle notified CME on

1

several occasions of its delays and inadequate performance. To address these issues, Great American maintains that Hinkle and CME began discussing a change order to the subcontract in December 2010. The change order was signed in February 2011, and Great American contends that it "constitute[s] a material change to the terms and conditions of the Subcontract, which Great American did not agree to, nor consent to, when it wrote its Bond for the Project." (Compl. [Docket 1], at ¶ 18.) Great American alleges that on March 15, 2011, Hinkle declared CME in default under the subcontract because it did not complete its work under the subcontract and change order. It further asserts Hinkle again declared CME in default on March 22, 2011, because it did not pay its sub-subcontractors and suppliers. On March 24, 2011, Hinkle notified Great American of CME's alleged default. In sum, Great American argues that:

> Despite the repeated alleged defaults by CME, HCC failed to put Great American on notice of such alleged defaults until its letter dated March 24, 2011. Such failure by HCC to provide notice to Great American of its principal's, CME, alleged defaults is in breach of HCC's obligations to Great American under the Bond.

(*Id.* at ¶ 21.) Great American asks this court to declare the Performance Bond *void ab initio* and to find that Great American is not liable to Hinkle under it. Alternatively, Great American requests that the court declare the change order a material alteration to the subcontract and unenforceable against Great American "in establishing its rights, duties, and obligations arising out of, or under its Performance Bond." (*Id.* at ¶ 31.) Finally, if the court does not grant either of these requests, Great American seeks a reduction of its liability *pro tanto* under the Performance Bond.

Hinkle filed a Motion to Dismiss or Stay Proceedings Pending Arbitration. Hinkle argues that the Performance Bond incorporates by reference the subcontract's arbitration clause. The arbitration clause applies to all disputes "arising out of, or relating to" the subcontract. This

2

includes, according to Hinkle, the allegations made by Great American in its Complaint against Hinkle. In opposing the motion, Great American asserts that while the arbitration clause requires arbitration of issues related to claims under the subcontract, it does not require arbitration of claims or defenses unique to the bond. This motion is now ripe for review.

## II.     Analysis

The Federal Arbitration Act (the "FAA") provides that written agreements to arbitrate in contracts relating to commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA requires a court to stay 'any suit or proceeding' pending arbitration of 'any issue referable to arbitration under an agreement in writing for such arbitration.'" *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (quoting 9. U.S.C. § 3). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). However, "[b]ecause the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements, we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal citation and quotation marks omitted). While state law controls issues of "validity, revocability, or enforceability of contracts generally," *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987), the FAA "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone*, 460 U.S. at 24.

A party can compel arbitration under the FAA by demonstrating: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the

agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."[1] *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)). The Fourth Circuit has explained that, "even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Id.* (quoting *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997)). The resolution of the defendant's motion turns on the second requirement: whether the written agreement to arbitrate in the subcontract covers the instant dispute. This determination is a matter of contract interpretation. *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996). Specifically, I apply state law principles of contract interpretation, while giving due regard to the federal policy favoring arbitration. *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004).

A number of courts have addressed the question of whether an arbitration provision in a contract or subcontract binds a surety when it is incorporated by reference in the bond. Some of these cases do not distinguish between the obligation of a surety to arbitrate its unique surety defenses versus obligations grounded in the underlying contract or subcontract. In addition, they typically rely on the federal policy favoring arbitration and the effectiveness of incorporation by reference. *See U.S. Fid. & Guar. Co. v. West Point Constr. Co., Inc.*, 837 F.2d 1507, 1508 (11th Cir. 1988) ("We conclude that the incorporation of the subcontract into the bond expresses an intention of the parties, including [the surety] to arbitrate disputes. Our conclusion is supported by the strong policy favoring arbitration expressed by Congress in the Federal Arbitration Act."); *Exch. Mut. Ins. Co. v. Haskell Co.*, 742 F.2d 274, 276 (6th Cir. 1984) ("[T]he performance bond incorporates by reference the subcontract, the subcontract incorporates by reference the general

---

[1] Here, the parties ask the court to dismiss or stay proceedings pending arbitration under 9 U.S.C. § 3, rather than compel arbitration. These same criteria apply, however, in this context.

contract and hence the duty to arbitrate."); *Compania Espanola de Petroleos v. Nereus Shipping, S.A.*, 527 F.2d 966, 974 (2d Cir. 1975) ("[T]he duty to arbitrate was indeed one of the rights and obligations under the contract which Cepsa, as guarantor, agreed to assume."); *Developers Sur. & Indem. Co. v. Resurrection Baptist Church*, 759 F. Supp. 2d 665, 668 (D. Md. 2010) ("The First, Second, Fifth, Sixth and Eleventh Circuits and several district courts have held that a surety must arbitrate disputes related to a performance bond where the performance bond specifically incorporated by reference a contract containing an arbitration clause."); *Rashid v. U.S. Fid. & Guar. Co., Inc.*, No. 2:91-0141, 1992 WL 565341, at *9 (S.D. W. Va. 1992) ("[Surety] is bound by the arbitrator's award against [contractor] at least insofar as it was rendered with respect to [contractor's] performance under the contract incorporated into the bond."); *Transamerica Premier Ins. Co. v. Collins & Co., Gen. Contractors, Inc.*, 735 F. Supp. 1050, 1051 (N.D. Ga. 1990) ("This case presents . . . a single question of law: does a performance bond that incorporates by reference a subcontract incorporate an unequivocal arbitration clause contained in that subcontract?); *Cianbro Corp. v. Empresa Nacional de Ingenieria Y Technologia, S.A.*, 697 F. Supp. 15, 20 (D. Me. 1988).

In contrast, some cases have explicitly held that disputes over bond obligations must be arbitrated. *See Jewish Fed'n of Greater New Orleans v. Fid. & Deposit Co. of Md.*, No. 01-30371, 2001 WL 1085096, at *2 (5th Cir. Aug. 29, 2001); *Commercial Union Ins. Co. v. Gilbane Bldg. Co.*, 992 F.2d 386, 389 (1st Cir. 1993); *U.S. Surety Co. v. Hanover R.S. Ltd. P'ship*, 543 F. Supp. 2d 492, 496 (W.D.N.C. 2008); *Ohio Cas. Ins. Co. v. City of Moberly, Mo.*, No. 4:05-cv-5, 2005 WL 2491461, at *3 (E.D. Mo. Oct. 7, 2005); *Hoffman v. Fid. & Deposit Co. of Md.*, 734 F. Supp. 192, 195 (D.N.J. 1990).

For example, in *United States Surety Co. v. Hanover R.S. Limited Partnership*, the contractor and subcontractor arbitrated their dispute. 543 F. Supp. 2d at 493. The surety participated in the arbitration but sought to limit the scope of its participation by reserving its right to litigate surety claims and defenses. *Id.* at 494. The court found that the surety was bound to arbitrate these disputes as well. *Id.* at 496. In doing so, the court noted the Fourth Circuit's expansive interpretation of the term "arising out of or relating to." *Id.* at 495 (citing *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93-95 (4th Cir. 1996)). It also explained that surety defenses are at least "related to" the subcontract because the bond's purpose is to ensure the subcontractor's performance under the subcontract and the bond incorporates the terms of the subcontract. *Id.* at 495. It further highlighted the Fourth Circuit's "heavy presumption" in favor of arbitrability. *Id.* at 496. Notably, the court did not point to any other language in the arbitration provision that indicated an intent to limit disputes to those that implicated the subcontractor's obligations under the subcontract.

In the Fifth Circuit case *Jewish Federation of Greater New Orleans v. Fidelity and Deposit Co. of Maryland*, the surety contended that the district court erred in compelling it to arbitrate its defense that the performance bond had lapsed. No. 01-30371, 2001 WL 1085096, at *1 (5th Cir. Aug. 29, 2001). The court began by discussing the presumption of arbitrability when an agreement contains an arbitration clause. It then explained that "arising out of or related to" has been interpreted broadly. Accordingly, the court held: "Mindful of the presumption of arbitrability . . . [surety's] defense is a 'controversy . . . related to the Contract', and is, therefore, arbitrable under its 'extremely broad' arbitration provision." *Id.* at *2.

In her dissent, Judge King explained that: "While I agree with my colleagues that Fidelity is bound to arbitrate any claims demanding construction of the underlying contract incorporated

6

by reference into the performance bond, I would not extend this arbitration requirement to Fidelity's personal defenses arising from the provisions of the bond itself." *Id.* at *3. Judge King explained that a better-reasoned line of cases held that:

> [I]ncorporation of an arbitration provision from an underlying construction contract does not bind the surety company to arbitrate with the contracting parties regarding disputes originating in the provisions of the bond, but instead ensures that the surety company participates in (or, at a minimum, is bound by the results of) an arbitration between the contracting parties based on the underlying subcontract.

*Id.*

Judge King's dissent is consistent with the Eighth Circuit's holding in *AgGrow Oils, L.L.C. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 242 F.3d 777 (8th Cir. 2001). In *AgGrow Oils*, an insurance company issued a performance bond guaranteeing the obligations of a contractor to an owner. *Id.* at 779. The bond incorporated by reference the construction contract. *Id.* A dispute arose among the parties and the surety moved to stay the owner's lawsuit, claiming that the owner was required to arbitrate its claim under the performance bond. *Id.* at 780. The court explained that, "[w]ithout question, incorporation of the Construction Contract clarified the performance obligations of [contractor] that [insurer] as surety undertook to guarantee." *Id.* at 781. But the court said, "it is less clear that the incorporation clause reflected an intent by [owner] and [insurer] to arbitrate *their* disputes under the bond – that intent is not clearly expressed." *Id.* Therefore, the court considered the circumstances surrounding the contract. The court then stated:

> [W]e are unwilling to construe an arbitration provision whose obvious purpose was to clarify the extent of the surety's secondary obligation as also reflecting a mutual intent to compel arbitration of all disputes between the surety and the obligee under the bond. . . . [W]e conclude there was no such agreement to arbitrate.

*Id.* Subsequent opinions have cited this decision approvingly. *See Liberty Mut. Ins. Co. v. Mandaree Pub. Sch. Dist. #36*, 503 F.3d 709, 711 (8th Cir. 2007); *White River Vill. v. Fid. & Deposit Co. of Md.*, Nos. 08-cv-00248, 08-cv-00359, 2009 WL 792728, at *5 (D. Colo. March 23, 2009); *A.E.R. Constr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. 3:07-cv-40, 2007 WL 3046324, at *3 (N.D. W. Va. Oct. 17, 2007).

I agree with the result reached in *AgGrow*—that in these circumstances Great American is not required under the arbitration clause to arbitrate bond disputes. However, these cases are fact specific and to determine the scope of the arbitration provision, I find the Fifth Circuit's analysis of an arbitration clause in a case involving a fiduciary liability insurance policy persuasive. *Tittle v. Enron Corp.*, 463 F.3d 410 (5th Cir. 2006). In *Tittle*, Enron maintained two liability insurance policies: a primary policy and an excess policy that incorporated the primary policy. *Id.* at 413. The primary policy insured, among others, Enron and its officers and directors. *Id.* The arbitration provision in the primary policy stated: "Any controversy or dispute arising out of or relating to this Policy . . . shall be settled by binding arbitration." *Id.* at 414. The remainder of the provision explained the procedures to be followed by Enron and the insurance company if the parties arbitrated a dispute. It specified that Enron and the insurance company would each appoint one arbitrator and the third one would be appointed according to the Conflict Prevention and Resolution Rules. *Id.*

The underlying lawsuit—a class action alleging breach of fiduciary duty—was brought by former employees against Enron and its board of directors. *Id.* at 415. A subset of defendants reached a proposed settlement with the plaintiffs where the parties agreed to require the insurers to pay the entire amount of the fiduciary liability policies. *Id.* In light of competing claims to the policy proceeds, the insurers intervened in the suit and filed an interpleader complaint to

determine the proper distribution of the policy proceeds. *Id.* The insurers named as interpleader defendants parties who submitted or could potentially submit claims against the policies, but were not parties to the proposed settlement. *Id.* Two of the interpleader defendants, Kenneth Lay and Jeffrey Skilling, filed a motion to compel arbitration of the interpleader defendants' competing claims to the policy proceeds. *Id.* at 416.

Like the instant case, the Fifth Circuit noted that the parties did not challenge the validity of the arbitration provision. Rather, they disputed its scope and whether claims among individuals covered under the policy (as opposed to claims between the insurance company and the insured) fall within the arbitration provision. The court noted that under Texas law, a contract must be read in a manner that renders contract terms internally consistent. *Id.* at 419. Applying this principle, the court found that "the scope of the Arbitration Clause is limited only to disputes, arising out of or related to the policies, that include an Insurer and one or more insureds." *Id.* at 420. The court explained that the provisions setting out the procedures for arbitration consistently refer to Enron and the insurer. It highlighted that, "the very procedures that the Arbitration Clause requires Enron and the Insurers to follow once binding arbitration has been invoked would be logical only in the case of a dispute where an Insurer is adverse to one or more of the insureds." *Id.* As an example, it cited the provision that requires Enron and the insurer to each appoint a member of the arbitration panel. The lack of procedures for disputes between the insured individuals, "indicates that the parties to the policies intended the dispute resolution procedures to apply only to the disputes for which procedures are provided – i.e., only to situations where there is a dispute with an Insurer." *Id.* at 421.

The court then explained that, "[a] dispute 'arises out of or relates to' a contract if the legal claim underlying the dispute could not be maintained without reference to the contract."

*Id.* at 422. The court found that the dispute among the insured individuals arose out of or related to the insurance policies because the policies are the source of the insureds' legal rights to the proceeds. *Id.* However:

> the Arbitration Clause contains further language limiting its scope to such disputes that include an Insurer and one or more insureds, notwithstanding the broad construction that some courts have given to "arising out of or related to" language in arbitration clauses in cases where the applicability of the clauses to specific parties was not an issue.

*Id.* The court determined that the dispute was wholly among insured individuals and therefore it fell outside the arbitration provision. *Id.* at 423.

> Applying this analysis to the instant case, I note that under West Virginia law:
>
> Where possible, all parts of the contract will be construed as to give force and validity to all of them, and to all the language used. A desire to effectuate the intentions of the parties creates the necessity of looking to the constituent elements of the contract, elucidating one by the other, and reconciling them, if practicable, to one common intent or design present to the minds of the contracting parties.

*Justice v. Stuyvesant Ins. Co.*, 265 F. Supp. 63, 65 (S.D. W. Va. 1967) (internal citations omitted); *see also White v. AAMG Constr. Lending Ctr.*, 226 W. Va. 339, 346 (2010) ("It is well-settled law that 'a contract must be considered as a whole, effect being given, if possible, to all parts of the instrument.'" (citing *Clayton v. Nicely*, 116 W. Va. 460 (1935))).

The arbitration provision in the subcontract states: "All claims, disputes, controversies and matters in question (hereinafter "Claims") arising out of, or relating to, this Agreement or the breach thereof . . . shall be resolved by mediation followed by arbitration or litigation at HCC's sole option." (Compl. at Ex. A, § 16.1.) The West Virginia Supreme Court of Appeals has not defined "related to," but it has discussed the meaning of the term "in connection with," under Virginia law, as used in a forum-selection clause. *Caperton v. A.T. Massey Coal Co., Inc.*, 225

10

W. Va. 128, 147 (2009). It explained that the term "in connection with" is "quite broad." *Id.* More specifically, it defined the term as "the condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in another." *Id.* (citing II THE OXFORD ENGLISH DICTIONARY 838-39 (1970)). The court noted the similarity between the terms "in connection with" and "in relation to," and cited a Third Circuit case that stated: "To say that a dispute 'arises in relation to' the [contract] is to say that the origin of the dispute is related to that agreement, *i.e.*, that the origin of the dispute has some 'logical or causal connection' to the [contract]." *Id.* at 148 (citing *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997)). Likewise, the Fourth Circuit has stated that "arise out of or related to" language is "capable of an expansive reach." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996). It "embrace[s] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Id.* (citing *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)).

The phrase "related to" is broad, but as Justice Scalia noted in a case concerning ERISA preemption, "applying the 'relate to' provision according to its terms [is] a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997); *see also N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (Souter, J.) (explaining that if "'relate to' were taken to extend to the furthest stretch of its indeterminacy" then it would have no limiting principle, "for 'really universally, relations stop nowhere.'").

Here, there is a strong argument that Great American's dispute with Hinkle is "related to" the subcontract, under the above definitions, because the bond and the subcontract are interdependent since the bond's purpose is to guarantee the subcontract. Said differently, the origin of the dispute between Great American and HCC has a causal connection to the subcontract because the dispute would not exist but for the subcontract. But, like the Fifth Circuit in *Tittle*, I am instructed under West Virginia contract law to look to the entirety of the subcontract and bond to determine whether the "arise under or relating to" language is limited in any respect.

The Performance Bond states that CME entered into a subcontract with Hinkle and incorporates that subcontract by reference. Under the bond, if the principal, CME, "promptly and faithfully" performs the subcontract, then Great American's obligation toward Hinkle is void. (Compl. at Ex. A.) If, however, Hinkle declares CME in default, then Great American may remedy the default or after reasonable notice, Hinkle or Great American may arrange for the completion of the CME's obligation under the subcontract. If Hinkle completes the work and the cost exceeds the balance of the subcontract price, then Great American pays Hinkle the excess but not more than an amount stated on the bond. On the other hand, if Great American completes the work, then Hinkle reimburses Great American for the portion of the balance of the subcontract price required to complete the subcontract. The bond also states that, "Any suit under this bond must be instituted before the expiration of two years from date on which final payment under the subcontract falls due." (*Id.*) As I see it, the obvious purpose of the incorporation by reference was "to clarify the extent of the surety's secondary obligation." *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 242 F.3d 777, 782 (8th Cir. 2001).

As stated above, the dispute resolution provision provides that all claims "arising out of, or relating to" the subcontract are to be arbitrated or litigated at HCC's option. (Compl. at Ex. A, § 16.1.) According to § 16.2(e), "HCC, Subcontractor and Subcontractor's surety agree that the disputed Claim shall be resolved in the appropriate forum selected by HCC at its sole discretion." (*Id.* § 16.2.) It continues by specifying that:

> If Subcontractor or its surety first commences a court action with respect to a dispute which HCC desires to have determined by an arbitration proceeding, or if Subcontractor or its surety first commences an arbitration proceeding which HCC desires to have determined by a court, HCC shall commence the arbitration proceeding or court action desired by HCC within thirty (30) calendar days after receiving service of *Subcontractor's complaint or arbitration demand*. If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, HCC becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common *to the dispute between HCC and Subcontractor* to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede HCC's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, then Subcontractor *and* its surety may be joined by HCC in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, *any pending action between HCC and Subcontractor* shall be dismissed.

(*Id.*) (emphasis added). The next subsection explains that if the amount in controversy of a dispute is over $250,000, then an arbitration panel will be comprised of three independent and impartial individuals with experience in the construction industry or construction law. In addition, "Subcontractor and HCC shall each appoint one member of the panel, who shall be neutral. The third member shall be appointed by the two selected neutrals or, failing agreement, according to the aforementioned Rules." (*Id.*)

These provisions reveal a limit to the "arising out of, or relating to" language. In *Tittle*, the court found that the arbitration procedures demonstrated that the arbitration clause was not intended to cover disputes between individuals covered under the insurance policy. 463 F.3d at

420. In contrast, here the arbitration procedures demonstrate that the surety and the contractor intended to arbitrate some, but not all, disputes. A surety maintains a defense to its duties pursuant to the underlying obligation (here, the subcontract) under three scenarios: (1) when the underlying obligation has been discharged by performance in accordance with its terms by the principal; (2) when the principal has a defense to the underlying obligation that can be asserted by the surety; and (3) when the surety has available a suretyship defense. RESTATEMENT (THIRD) OF THE LAW: SURETYSHIP AND GUARANTY § 19 (1995). The first two scenarios implicate the terms of the underlying subcontract and the rights and obligations of the principal. The third scenario provides defenses to a surety that are independent of the subcontract. A dispute over whether the surety has a defense under the third scenario originates in the bond, not the subcontract. In such a bond dispute, the subcontractor does not have a stake in the outcome because it arises from obligations that the obligee owes the surety, independent of obligations between the principal and the obligee that the surety guaranteed.

As evidenced by the italicized language from Section 16.2 of the subcontract, the arbitration provisions are based on the assumption that the subcontractor would be involved in the dispute or at least that the surety would be asserting defenses available to the subcontractor. (Compl. at Ex. A, § 16.2.) Additionally, the provision stating that only the subcontractor and Hinkle appoint members to the arbitration panel provides strong evidence that the parties intended the contractor's and subcontractor's interests to be adverse in any arbitrated dispute.

Accordingly, I **FIND** that the arbitration provisions, read in their entirety and in the context of the relationship among Hinkle, CME, and Great American, were not intended to "bind the surety company to arbitrate with the contracting parties regarding disputes originating in the provisions of the bond." *Jewish Fed'n of Greater New Orleans v. Fid. & Deposit Co. of Md.*,

14

No. 01-30371, 2001 WL 1085096, at *3 (5th Cir. Aug. 29, 2001).  As discussed above, the main contention of the Complaint is that Hinkle failed to notify Great American of allegations of default and the change order, which "constitute[s] a material change to the terms and conditions of the Subcontract, which Great American did not agree to, nor consent to, when it wrote its Bond for the Project."  (Compl. at ¶ 18.)  Therefore, I **FIND** that this dispute does not fall within the scope of the arbitration provision in the subcontract because it is a bond dispute and does not maintain defenses under the first two scenarios outlined above.  The defendant's Motion to Dismiss or Stay Proceedings Pending Arbitration is **DENIED**.

     The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court DIRECTS the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:     December 5, 2011

*[signature]*
Joseph R. Goodwin, Chief Judge